DECISION AND JOURNAL ENTRY
Defendant Leslie R. Hall has appealed from a judgment of the Summit County Common Pleas Court that found him guilty on charges of rape and kidnapping. This Court affirms.
 I.
On May 11, 1999, Defendant was charged with ten counts of rape, a violation of R.C. 2907.02(A)(1)(c), and one count of kidnapping, a violation of R.C. 2905.01(A). Defendant pled not guilty, and his case proceeded to trial. On October 27, 1999, the jury found Defendant guilty on all charges. The trial court sentenced Defendant to a term of ten years for each count, to be served concurrently. Defendant has timely appealed, asserting one assignment of error.
 II. [Defendant's] conviction on charges of rape and kidnapping was against the manifest weight of the evidence and/or was not supported by sufficient evidence.
In his sole assignment of error, Defendant has argued that his conviction for rape and kidnapping was not supported by sufficient evidence and was against the manifest weight of the evidence. This Court disagrees.
As an initial matter, evaluations of the sufficiency of the evidence put forth by the State and the weight of the evidence adduced at trial are separate and legally distinct determinations.State v. Gully (Mar. 15, 2000), Summit App. No. 19600, unreported, at 3. To determine whether the evidence before a trial court was sufficient to sustain a conviction, an appellate court must view that evidence in a light most favorable to the prosecution:
 An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; see, also, State v. Thompkins (1997), 78 Ohio St.3d 380,386 ("`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law").
While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. Id. at 390 (Cook, J. concurring). In determining whether the State has met its burden of persuasion, a reviewing court does not view the evidence in the light most favorable to the State. Gully, supra, at 3. Instead, a reviewing court must:
 review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Otten (1986), 33 Ohio App.3d 339, 340. A new trial is warranted only in the exceptional case where the evidence weighs heavily in favor of the defendant. Id.
R.C. 2907.02(A)(1) provides, in pertinent part, that:
 No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
* * *
 (c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.
Finally, R.C. 2905.01(A) provides that "[n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in [R.C.2907.01] with the victim against the victim's will."
During the spring of 1999, Defendant and the victim began communicating on the Internet in an American Online, Inc. (AOL) chat-room, created for persons with disabilities. Defendant told the victim that he was 19, when in fact he was 39. He lived in Akron, Ohio, while the victim lived in Avoca, Pennsylvania. Defendant's disability resulted from a motorcycle accident, which left him unable to work and on permanent disability. On the other hand, the victim, who was 19, had a learning disability since childhood. At trial, Dr. John Harvey diagnosed the victim as having a mild case of mental retardation. The victim could not count money, tell time, or read cursive handwriting. Her academic level is around the third or fourth grade. She resided at home with her parents, and had no employment. Each day the victim would help her parents with chores around the house, feed her pets, and talk on the Internet. Her parents do not leave her unsupervised when they go out.
After approximately two months of "on-line" chats, Defendant invited the victim to come visit him in Akron. Because of her disability, the victim needed Defendant's assistance in planning the trip. Defendant called the bus station to find out the cost of the bus ticket and helped the victim count the money over the Internet. When the victim did not have enough money from her allowance, Defendant told her to take the money from her parents.
On May 8, 1999, Defendant arranged for a taxicab to pick up the victim at approximately 4:00 a.m. The cab transported the victim from her house to the nearest bus station. When purchasing her ticket at the bus station, the victim laid out all of her money on the counter for the clerk to count. At this point, the clerk informed the victim that she needed two more dollars for the ticket to Akron. The victim was able to purchase the ticket after she borrowed the money from a stranger.
After several layovers, the victim arrived in Akron that night. She immediately called Defendant from the bus station. Defendant sent a taxicab to pick her up and transport her to his house. Because the victim had no more money, Defendant paid for the cab. The victim testified at trial that she had no idea how she was going to get home.
Once inside the house, Defendant began touching her and kissing her with his tongue. The victim testified that this made her uncomfortable. As the two were waiting for dinner, Defendant began unbuckling the victim's pants and began touching her vagina with his hand insider her underwear. He then took off her clothes, put her on the kitchen table, and performed oral sex on her. The victim testified that she told Defendant to stop, but he did not and told her to relax.
Next, the victim testified that Defendant carried her into the bedroom, laid her on the bed, and began having intercourse with her. She told him to stop because it hurt. Again, he did not stop and told her to relax. The victim also stated that he put his fingers inside her vagina and also performed anal sex on her. She testified that she was too afraid to resist Defendant. That night she slept on the couch and cried.
The next day, May 9, 1999, the victim watched television with Defendant. She testified that Defendant left her alone when he went to the grocery store; however, she did not call home because she forgot the new area code. Defendant started touching and kissing the victim again when they were cooking dinner in the kitchen. He took off her clothes and inserted his penis in her vagina. He then forced her to perform oral sex on him by holding the back of her head with his hand. The victim told Defendant that she did not want to do this and to stop. He replied that there was nothing to worry about. Defendant ejaculated in the victim's mouth.
On May 10, 1999, the victim testified that she watched a movie with Defendant. Again, they engaged in vaginal and anal intercourse. Defendant received an e-mail from the victim's mother. This e-mail stated that the victim's mother was having a heart attack because of the stress of her daughter's disappearance. Defendant decided to respond to the message. He created a different address, entitled "Angel56" and sent it to the victim's parents, her sister, and his regular e-mail address. The message appeared to be from the victim and stated that she was fine. A printout of this message, along with other messages, was found at Defendant's home.
The victim's parents testified at trial that they could tell the message was not from their daughter because of the grammar and sentence structure. They tried to respond to the message; however, the address was erased. They contacted the police and were able to get AOL to release Defendant's name and address. With this information, the Avoca police contacted the Akron police department, who went to Defendant's house. The victim's parents then drove to Akron that night.
Akron Officer McKeel testified at trial that at approximately midnight, on May 11, 1999, he and Akron Officer Hanzel arrived at Defendant's house. The two had received a call from the dispatch concerning a missing person. The report gave the victim's name, physical description, birth date, social security number, and that she was mentally retarded. Defendant told the officers that the victim was in the house and allowed them to make use of his phone and computer. After confirming that the victim was the person reported missing, the officers took her to the police department. Officer McKeel later learned that the victim's parents were driving to Akron from Pennsylvania.
Because the victim was not a juvenile and no holder was obtained, the police department returned her to Defendant's house. Officer McKeel testified that if the victim would have told them what happened, they could have taken her to a shelter. However, because they were not aware of anything that had happened, they did not advise the victim of other places to go. At trial, the victim testified that she did not tell the officers about the sexual activities because she was afraid that she would get in trouble. When asked why she had told the officers that she wanted to return to Defendant's house, the victim stated that she was confused and did not know where she wanted to go. When she returned to his home, Defendant engaged in vaginal and anal intercourse with her again. She protested, and he told her to relax. She testified that it hurt for her to use the bathroom and that she found blood in her underwear.
Later that morning, Sergeant Hughes, from the Akron Juvenile Detective Bureau, decided to investigate the situation. Sergeant Hughes and Sergeant Caprez went to Defendant's house. The victim's parents followed them to Defendant's house. Again, Defendant invited the two men into his home to question the victim. After talking to Sergeant Hughes, the victim agreed to go with him to Children Service Board (CSB). Sergeant Hughes testified that the victim's mannerisms were child-like and that he suspected sexual abuse. He passed on this information to Shelly Kekic, a social worker at CSB.
At CSB, the victim met with Ms. Kekic and Erik Skeen, another social worker. After interviewing the victim separately, the social workers then allowed her parents in the conference room. Concerned that something was wrong, the victim's mother asked if she could speak with her daughter alone. At this point, the mother learned that her daughter had been sexually abused.
Ms. Kekic arranged for an examination at Children's Hospital, while Mr. Skeen interviewed the victim in more detail. At the hospital, the victim was interviewed by Wendy Facchini, a social worker at the Children At Risk Evaluation Center. Ms. Facchini testified at trial that the victim had described each type of sexual conduct and that it had occurred three or four times.
Next, Donna Abbott, a nurse practitioner, examined the victim. Ms. Abbott testified that she found that the victim had two tears in her vaginal area and one tear in her anal area. She stated that these tears are uncommon and are consistent with the victim's allegations.
Defendant testified at trial that he had met the victim on the Internet. He admitted that he paid for the cab to his house; however, stated that it was the victim's idea to come visit him. He admitted that he had sexual intercourse with the victim, but stated that the victim had consented. He also thought the victim was smart and believed that the victim's parents beat her.
In light of the foregoing, this Court concludes that this is not an exceptional case in which the weight of the evidence warrants a new trial. This Court will not overturn a judgment based solely on the fact that the jury preferred one version of the testimony over the other. State v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, unreported, at 4. The jury was entitled to believe the testimony of the State's witnesses. Indeed, this is not a case where the evidence weighed heavily in Defendant's favor. Moreover, "[b]ecause sufficiency is required to take a case to the jury, [and] a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency," (Emphasis sic.) see State v. Roberts
(Sept. 17, 1997), Lorain App. No. 96CA006462, unreported at 4, Defendant's assertion that the State failed to present sufficient evidence to support his conviction, therefore, is also without merit. Defendant's assignment of error is overruled.
 III.
Defendant's sole assignment of error is overruled. The judgment of the Summit County Common Pleas Court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ BETH WHITMORE
FOR THE COURT, BATCHELDER, P. J., BAIRD, J. CONCUR.